Samuel C. Coleman, J.
Three members of the Bar, one of them also and essentially a certified public accountant, were named executors and trustees under a will. In the course of exercising their functions as executors, they opened a checking account and a savings account in the defendant bank, in the name of the estate. Withdrawal of funds in each account was to be made only upon the signatures of all three executors, later (and so during the period to be mentioned) changed to two. In September, 1960 two of the three, Clyman and Marks (the latter, lawyer and accountant) learned that the third, Glasser, in the period from February, 1958 through June, 1960, had forged the signature of Clyman, never Marks, to 42 checks and 8 withdrawal slips of the savings account (Glasser as payee of the checks and the person making the withdrawals from the savings account), adding his own name of course to these instruments, and that, *200 by this means, he had stolen about $15,000 from the estate. Glasser alone handled the bank accounts, deposited checks, made out checks, had possession of the savings account passbook; at irregular intervals he furnished “ transcripts ” of his own making to the two other executors, always concealing, of course, his thefts. All vouchers were returned to him; his office address was the estate’s address so far as the bank was concerned. Glasser was indicted; he pleaded guilty to the indictment; sentence has not yet been imposed; and he has resigned from the Bar. He was removed from his office of executor and trustee. The forgeries were discovered after the three had accounted to the Surrogate and had been discharged as executors, except as they were required to turn over the corpus of the estate to themselves as trustees. They have not yet made good to the estate the amount stolen by Glasser. In later proceedings before the Surrogate, Glasser filed an amended accounting, revealing his misconduct. He was discharged from his obligations to the estate except as to the amount of his defalcations, as to which there is a subsisting decree of the Surrogate against him, directing payment. But he is apparently without means. He was committed under a contempt order for failing to satisfy the decree and later released by the Surrogate.
It is Glasser’s apparent inability to restore the amount of his thefts that induced the climate in which these actions were commenced, prosecuted, and tried. The two remaining executors and trustees, in their representative capacities, sued the bank for the payments upon the forged signatures and the withdrawal slips, but they did so in two separate actions (later consolidated), each one proceeding separately against the bank and each one in his respective pleading charging the other with negligence and with lack of care in one capacity or another — Marks as accountant as well as executor — negligence and lack of care which, each said, facilitated, if it did not make possible, the criminal acts of Glasser. (Some of these claims — executor vis-a-vis executor — were withdrawn; I shall discuss them later.) Both Marks and Clyman sue Glasser; the bank also asks judgment against him and at first also asked judgment over against Marks and Clyman as to any judgment against it.
I take up the case against the bank and, first, the checking account.
As to the bank’s liability: “ The general rule of law is that a bank may pay and charge to its depositor only such sums as are duly authorized by the latter, and of course a forged check is not authority for such payment. It is, however, permitted to a bank to escape liability for repayment of amounts paid out *201 on forged checks by establishing that the depositor has been guilty of negligence which contributed to such payments and that it has been free from any negligence ” (Morgan v. United States Mtge. & Trust Co., 208 N. Y. 218, 222).
On the depositor’s conduct: “ the depositor [is] required to exercise diligence in examining his returned cancelled vouchers and in notifying the bank within a reasonable time of the fact of the forgery” (Maryland Cas. Co. v. Central Trust Co., 297 N. Y. 294, 302). And, fixing an outer limit within which a depositor must act to question the bank’s conduct, section 326 of the Negotiable Instruments Law provides: “No bank shall be liable to a depositor for the payment by it of a forged or raised check, unless within one year after the return to the depositor of the voucher of such payment, such depositor shall notify the bank that the check so paid was forged or raised ’ ’.
Of the 42 checks, 30 had been paid and the vouchers returned to Glasser before September 10, 1959. The bank was not informed of the forgeries until September, 1960. These checks total $4,742.51. As to these, the bank contends that, without reference to any of the conventional rules dealing with the liability of a bank for paying upon forged checks — negligence of the depositor — contributory negligence of the bank — the case, by virtue of the Negotiable Instruments Law, is foreclosed.
The statute, says the bank, fixed the time — one year from the date of the return of any voucher — within which inaction of the depositor precludes him once and for all (cf. Stella Flour & Feed Corp. v. National City Bank of N. Y., 285 App. Div. 182, affd. 308 N. Y. 1023). The plaintiff replies that while the general rule would apply in an ordinary case, it does not apply where the depositor is a “ fiduciary ” (Maryland Cas. Co. v. Central Trust Co., 297 N. Y. 294, supra). In the Maryland Cas. case, the section was held inapplicable to a claim in behalf of a bankrupt estate against a bank where the trustee in bankruptcy, signing checks against the estate, had forged the countersignature of the Referee in Bankruptcy and had himself received the proceeds. The section was inapplicable because the common-law rule itself, which in some instances relieves a bank from liability for payment of forged checks cannot in any way apply, irrespective of the lapse of time. The Referee in Bankruptcy, the court said, was a judicial officer, superior to the trustee, his signature was not a “ second signature ” and the bank, in accepting the designation as a depositary by the United States District Court, put itself in a special category. It agreed to hold itself responsible to the District Court without reference to questions of negligence and contributory negligence. But as *202 between executors and bank the relationship is the conventional one of common-law debtor and creditor, notwithstanding the fact that as to the beneficiaries of the estate the executors are “ fiduciaries ” (Morgan v. United States Mtge. & Trust Co., 208 N. Y. 218, supra). In the Morgan case, the fact that the depositors were two trustees under a will was not regarded as of any consequence; a deposit in behalf of an estate imposed no greater liability upon the bank than it would otherwise have been subjected to. The bank was discharged from liability as a matter of law for payment upon forged checks, on the ground that there was nothing to justify a finding of negligence on its part. And the Morgan case was cited, among others, by the court in the Maryland Cas. case (supra, p. 302) in its statement of the rule requiring a depositor “ to exercise diligence in examining his returned cancelled vouchers and in notifying the bank within a reasonable time of the fact of the forgery ”. (Cf. Grace v. Corn Exch. Bank Trust Co., 287 N. Y. 94; Clarke v. Public Nat. Bank & Trust Co. of N. Y., 259 N. Y. 285; Bischoff v. Yorkville Bank, 218 N. Y. 106.) A deposit by a fiduciary does not alter the debtor-creditor relationship — does not enlarge the bank’s liability, with or without reference to section 326.
Section 326 of the Negotiable Instruments Law, the court said in the Maryland Cas. case (p. 303), “was not meant to include * * * forgery of a counter-signature of an official of the District Court required by a court rule * * * before the defendant was authorized to honor its depositor’s checks ”. Indeed it would be pursuing a will-o-the-wisp to have attempted to exonerate the bank. The cancelled vouchers were not returned to the depositor; return to him alone would have been fruitless; and he alone was the depositor. Here, the. three executors together were the depositors; and the return of the vouchers to Glasser was a return to all three of them as though the three constituted a partnership, or just as a return to Glasser himself, as an officer of a corporation, would have been a return to the corporation if we were dealing with a corporation (Morgan v. United States Mtge. & Trust Co., 208 N. Y. 218, supra; Shattuck v. Guardian Trust Co., 204 N. Y. 200). If the plaintiff’s reading of the Maryland Cas. case is correct, the bank would be liable out of hand for the total amount of the thefts irrespective of the lapse of time. But they make no such contention, limiting their reliance upon it to the early checks.
I think the ordinary rules should prevail and that the bank is discharged from liability for the first batch of checks.
*203 As to the second batch, the conventional rule applies. Difficulties arise from the fact that although the bank’s liability in the first instance flows from the rules of contract, in passing upon the bank’s liability, we often depart from those rules to introduce notions of negligence and contributory negligence. But the problem resolves itself into a question of reasonableness of conduct.
The bank contends that the two executors were negligent in failing to examine the vouchers and to return them. I believe they were. As against the bank, they cannot say that they were at all times and in all circumstances warranted in relying on G-lasser. Since the return of the vouchers to Glasser was a return to them, they were charged with knowledge of what a simple reconciliation of checks and checkbooks or examination of the monthly bank statement would show — if nothing more. And they did nothing, over a long period of time. Assuming their negligence, the bank would not be absolved from liability if its own negligence contributed to the loss. I come to the conclusion that the bank was guilty of contributory negligence in the manner in which it handled the checking account. Contributory negligence here — and necessarily in the great majority of cases — turns into a question of the bank’s exercise of reasonable care in its own obligation to detect forgeries. Obviously “ reasonable care ” cannot call for the services of a handwriting expert as to every check that passes over the counter of a large busy city bank. Nor does it even call for “ expertness ” on the part of tellers; but it does call for prudence. There was expert testimony in behalf of the plaintiffs, which I accept, that the forgeries were of such a nature that an average teller, even one without training in handwriting or in detecting forgeries, should have noticed them, checks and withdrawal slips. 11 All that was needed was comparison of the signatures ”. That testimony was not contradicted, although the expert did state what is obviously the fact, that in the rapid movement of negotiable paper through New York banks it is not the custom of tellers to examine signatures. But tellers should, or the rule holding the bank liable for forgeries becomes thinned down almost to nothingness.
My own inspection of the forgeries leads me to the same conclusion as the expert’s. In a sense, all persons familiar with handwriting may be said to be “ expert ” in that they are able to recognize or identify handwriting as being that of a friend or relative. Here the differences are “ obvious ” in the character and gesture of the two handwritings. There is no testimony from the bank in contradiction of the plaintiff’s expert and only a brief reference to the kind of training its prospective *204 tellers received. The training was of a casual, if not of an indifferent, character. “ There is no set course on it ”, the bank manager said. ‘ ‘ I really don’t know how far they go in training. * * * I doubt that they are told how to go about making comparisons ”. With the burden on the bank to prove itself free from contributory negligence, it can hardly refer to a practice in training which leaves tellers in no position even “ to make comparisons ’ ’.
I reach the same conclusion with respect to the savings bank account. The fraudulent withdrawals (one was deposited in the checking account) total $4,065. Though different considerations apply — presentation of the savings account book, withdrawal slips — the ultimate test is the same: reasonable care on the part of a given teller (Noah v. Bank for Sav. in City of N. Y., 171 App. Div. 191). The testimony of the plaintiff’s expert, I have said, related to the withdrawal slips as well as to the checks. And what I said as to the forged checks applies to the forged withdrawal slips. The bank was negligent. The bank cannot claim that the production of the savings account book by itself immunizes it from liability.
As to the claims of the executors against each other: Marks withdrew his claim against Clyman; Clyman presses his claim against Marks and Company (the name under which Marks practices his profession as a certified public accountant), and through the “ company ” to Marks himself as an executor. That is to say, Clyman asserts he is making a claim against Marks, not as an executor, but as an executor who is an accountant. And because Marks, executor, was also an accountant and received compensation from the estate as an accountant (for some services, at least), he owed a greater duty to the estate than he, Clyman, did. I do not think it necessary to go into the details of the claim which Clyman is making against Marks. This aspect of the case troubled me from the beginning, and I so stated to the attorneys — then, and in conferences after the trial was concluded. What we are presented with is the unedifying spectacle of two executors and trustees, both members of the Bar, one also a certified public accountant, trying to place the onus of responsibility for Glasser’s conduct, that is, failure to discover what Glasser was doing, upon the other; or, at least, trying to exculpate himself from any responsibility.
I spoke earlier of the atmosphere in which the case was tried — the atmosphere of hostility between Clyman and Marks. That hostility betrayed itself in the testimony of each, which was at times self-contradictory as well as contradictory of the other — attempting to incriminate the other, abandoning the attempt. *205 I stated earlier that I believed Clyman and Marks were negligent in not having detected the forgeries. They were, so far as the bank was concerned; they were the “ depositors ” equally with Glasser and so charged with the obligation of a depositor to a bank. But are they responsible to the estate for their inaction, their passivity? That is what disturbs Clyman and Marks. And while the court by virtue of its plenary jurisdiction may proceed, is this the forum in which the controversy between the executors should be decided? (Cf. Wyatt v. Fulrath, 13 A D 2d 250; Reilly v. Wygant, 11 A D 2d 647; 1 Warren’s Heaton, Surrogates’ Courts [6th ed.], p. 135.)
There was no real representative of the estate. The beneficiaries are not parties and have scrupulously refrained from participating in any aspect of the trial. Clyman, considering his involvment, is not the beneficiaries’ champion to fasten liability upon Marks for dereliction of duty on Marks’ part, nor is Marks, with his possible liability, their champion to assert a claim against Clyman. Neither one, vis-a-vis the other, is really here in a representative capacity. Both join against the bank (the claim against the bank must, of course, be decided and a good deal of the testimony related to that claim); but they part company thereafter. Both are executors and trustees and each will be called upon to account for himself, for his own conduct, with respect to the discharge of his obligations, as executors and as trustees. That can be done only in the Surrogate ’s Court where, although they have accounted as executors, they have not yet satisfied the decree directing them to transfer the corpus of the estate to themselves as trustees; and the beneficiaries may at any time call upon them to do so in the very accounting proceedings. And there has been no accounting under the trust. If Marks was derelict in his duties (however those duties are measured), the Surrogate will surcharge him; and so with Clyman. Marks’ withdrawal of his claim against Clyman will have no significance with the Surrogate; exoneration of Marks here will not affect the beneficiaries in the Surrogate ’s Court — they are not parties here and they may have some basis, not known to me, for charging Marks. And Marks may be able, against the *beneficiaries, to offer testimony— personal relations with the beneficiaries — not available to him in this action. If a decree should go against him, which he satisfies, is Clyman thereby absolved?
The unreality of the Clyman proceeding against Marks appears from a reading of the Surrogate’s decree on final accounting (Feb. 23, 1960 as of Jan. 2, 1959), on a petition in which all three executors joined. There was an assumption that *206 all the funds stated to be in the bank accounts were in fact there. They were not, to Glasser’s knowledge. I assume that on the day of filing the accounting (April —, 1959) the other two were ignorant of Glasser’s misconduct. But the beneficiaries were not aware of what was going one; the Surrogate was not told about it. The decree directed the executors to turn over to themselves, as trustees, the corpus of the estate as determined by the decree. This, I have said, they have not yet done; nor will they be able to do so except to the extent that Glasser and the bank reimburse the estate, or unless they make reimbursement personally. It may be, as Clyman contends, that Marks as accountant is subject to a higher degree of responsibility than Clyman; Clyman as the “absent executor” (he lived out of town in the period in question and discharged his duties largely by mail) may — notwithstanding his contention — be called upon to pay the penalty for his “ absence ”. Both — as against the estate — may have acted properly in leaving the handling of the checking account to Glasser, a member of the Bar and friend of the decedent and of Marks for many years. Marks asserts that the Surrogate’s decree “estops” Clyman from proceeding against him — indicating, again, adversary proceedings between two executors and trustees, each of whom is responsible for his conduct, not to the other, but to the beneficiaries. Marks also relies upon the later accounting by Glasser in which he admitted his wrongdoing. But, again, only Glasser’s conduct was in question; no others. A determination against Marks leaves unanswered the question of Clyman’s liability; and that will have to be decided by the Surrogate. The Surrogate will have all parties before him: the beneficiaries and the two executors, as individuals and in their representative capacity. In one proceeding he will be able to decide all the questions involved fully and once for all — and make, appropriate decrees. In those circumstances, the court should not proceed to a piecemeal disposition of an unseemly litigation in which people suing in a representative capacity represent themselves. The quarrel with the bank can be disposed of here; the quarrel between the ■ executors should not.
The causes of action of Clyman against Marks and Marks and Company must be dismissed without prejudice. The complaints against Glasser are dismissed, without costs; he is already in judgment. Bach of the plaintiffs will have judgment against the bank for $8,156.25, with interest, with one bill of costs. The bank’s cross complaint over against Marks is dismissed, without costs. In the face of its own negligence, the bank cannot shift its liability to Marks — as executor or as *207 executor accountant. It had no dealings with Marks as accountant ; and it did not have any copy of his reports. The bank will have judgment over against Glasser in the amount recovered against it, with costs. Glasser is the culprit. All other claims have been withdrawn.